Loffer versus Red Door 88 and Camfield Properties numbers 22-1055 and 22-1106 and I believe Mr. Bacon you are representing the plaintiff? Yes, your honor. Good morning. My name is Tom Bacon. I represent, can the court hear me? Yes, I can't hear myself. I represent the plaintiff appellant Debra Loffer and as I brought to the court's attention a couple of weeks ago, well there's no conflict among the circuits, one of them being the First Circuit in Atchison which ruled in our favor. The Atchison defendant recently filed a petition for writ of certiorari to the Supreme Court. That was on November 2nd. It was docketed on the 8th. It involves the same issues that are presented to the court today, except of course while this court would be constrained to apply existing Supreme Court law, the Supreme Court would be free to overturn it if it so chooses. Should we sit on this appeal until we find out what the Supreme Court does? I think that's what's going to happen. At the same time I argued the Looper case last year. I was discussing with Mr. Rotter earlier this morning. I had also argued the case in front of the Fourth Circuit. They haven't ruled. It took the First Circuit until just recently to rule and we argued at pretty much the same time. The Eleventh Circuit which ruled in our favor now has a petition for rehearing and bank. And I'm familiar enough with the Eleventh Circuit to be able to state that there was a wide difference of opinions within the Eleventh Circuit as to how the law applies to the ADA. If the Supreme Court rules one way or the other, it would dispose of this case. The same issues apply. In other words, how does this case fit within Spokio and TransUnion? How does this case fit within Havens Realty? And then the Supreme Court will determine if Havens Realty does apply, do they still like it and are they going to overturn it in light of the fact that the politics of the Supreme Court has become more conservative. So the main issues are... Just a quick question. I take it no response has been filed yet to the cert petition? No, my response is due December 8th. I am inundated with advocacy groups that want me to oppose the writ for cert, you know, the cert petition. I personally think it should go up. But I do think that because they're obviously, you know, we have the Looper case in this circuit. We have the Mann case in the Fifth Circuit. We have the Hardy case in the Second Circuit. Ganesha followed it. And then D.C. issued an opinion, issued a ruling against us without a published opinion. And then we have the Eleventh Circuit, which is in limbo. And the First Circuit, which is ruled in our favor. What's the name of the Fourth Circuit case? The Fourth Circuit case is Laufer v. Naranda. N-A-R-A-N-D-A. And typically when I'm in an oral hearing, I have a pretty good idea how the case is going to go based on the questions of the judges. And all I know from the Naranda case is that one of the judges there had been one of the same judges from the Griffin opinion. And he was most adamant that Griffin was limited. And he was arguing with me over that. And I guess I failed to convey that I was agreeing with him that Griffin should be limited. So the Supreme Court, as your honors would know, when it issued the Spokio opinions, sort of settled a lot of the other courts in a tizzy over how to interpret it. And in the Eleventh Circuit in Sierra v. City of Hellendale, Judge Newsom had issued a long concurring opinion as to exactly how discombobulating that ruling was. And so I think that even taking Luper and Acheson and Arpan and Mann and put them all together, I still think there can be a reconciliation. Because in TransUnion and Spokio, they said they identified two sorts of statutes that would apply to us conceivably. One is the sort of statute where there's a bare procedural violation that Congress created and made it actionable. And the court said, no, that's not necessarily enough if it's completely divorced from any sort of real-world harm, in which case Article III requires some sort of additional harm be shown. The other sort of statute – and the example that Spokio gave was an improper zip code in violation of the Fair Credit Reporting Act. How can that possibly be even creating a risk of harm? In TransUnion, the other sort of statute they identified was the sort of statute where there was a real-world harm which Congress enacted and made actionable by statute. And in that case, it's a de facto concrete injury and courts must apply that injury or apply the definition of the statute to the injury with nothing additional required. And it gave one example, and that was discriminatory treatment. But there's still confusion because the next sentence sort of talks about both sorts of statutes in a single sentence. And the decisions that we're seeing coming out of that don't see it with the sort of clarity that I do. Well, it seems like we do have a bit of a mess in this area. And your prolific client has contributed to trying to figure out whether informational or stigmatic injuries are going to be adequate to get Article III standing. But two-part question one is it would not break your heart if we abated this case to see what happens with the other cases that are hurtling up to the Supreme Court. You did not appeal Looper to the Supreme Court, is that correct? No, there was not a conflict among the circuits at the time. And I was going and at the time that the Ganesha case followed the Hardy case ruled against me. There also was not a conflict because that would have been based on only the 11th Circuit's decision. And that was not mandated or final. That was the petition for rehearing in bank had been filed in that case. So that was in limbo. So I really was never presented with a time within the 90-day window to file a petition for writ of certiorari because I never had a conflict between the circuits during that time. But the Atchison defendant did. Also, if one reads the Atchison opinion and compares that to the ARPAN opinion, the Atchison opinion I think is more true to my arguments. The ARPAN opinion is – you have one opinion. Yeah, the judge who wrote the main opinion also wrote a concurring opinion to show that those judges, even though they were on the same side, still could not agree. I mean like for example, is discrimination a real-world harm? I mean Congress identified it in the findings and purposes as all the real-world harms. Is discrimination a real-world harm? And if it is, then in my opinion, my argument is that's that. That's what Spokio and specifically TransUnion identified as the instance where you don't look further. You don't go for additional harm after that. Could you just – I just want to hear you articulate why Looper doesn't control the panel today. Or if you think it does control, that would really be helpful. Well, first, at the time Looper was issued, there was no conflict. And the other thing is that Looper had specifically declined to consider stigmatic injury in its analysis. According to ARPAN and according to Atchison, that makes all the difference in the world. Is your complaint in these two cases sufficiently different than the Looper complaint for purposes of standing? I don't know whether or not – well, yes and no. I don't know off the top of my head whether or not the complaint in Looper had identified frustration and humiliation. Mind you, these were minor theories at the time because until the Sierra case came out and the ARPAN case came out, saying that those are really important, I don't know if those were in that complaint. Well, could I just build on that question a little bit? What have you alleged in the complaints in this case that you didn't allege in Looper to support standing? What do we have to work with here that maybe we didn't have to work with when we had Looper? If I could just finish that one answer. Looper had – it was in footnote 9. And it stated that it didn't consider it because we hadn't raised it in our briefing, not as far as an allegation in the complaint, simply that it was not raised in the briefing. Because in the appellate brief, I didn't raise it. But there was a notice of supplemental authority where I did raise it. There was a supplemental brief that the Looper court requested where I also raised it because that was posted there. Okay. But you've raised it now. Raised it now. That's really the point now. But is there anything else? If stigmatic injury is on the table right now, is there anything else that's an add-on to Looper? Yes. I'd like the court to reconsider whether or not Havens Realty applies. Looper said that Havens Realty did not – No, I'm not asking about reconsidering an analysis in Looper. That sounds more like an argument that you could have made on a petition for a hearing or for en banc. I'm asking whether you've alleged any other facts here that would help you on standing that you didn't have in Looper. Facts, not a legal argument. It's possible that frustration and humiliation were not in the Looper complaint. But the issue was really whether or not it was argued in the briefing to the Looper court, which is why Looper declined to consider stigmatic injury. Let me see if I can help you out a little bit. The visit to Colorado in July of 2021, does that put this appeal in a different posture than the Looper appeal? It does. She had visited and she made good on her intentions and did go to all the states she had intended to go to, including through all the areas of Colorado, including near the – in the vicinity of the hotels. But as a practical matter, once – I brought up the New Mexico cases where they said, no, that's not enough. And I brought up the – in this case, they said, well, that's not enough. She had to have stayed at that hotel. And there was a Vermont case where a different plaintiff had driven right past that hotel on his trip. And the court said, no, that's still not enough. Once you get past my initial theories of law, it becomes one of those cases of endless fractals and moving goalposts where there will be no set of circumstances that a person can ever satisfy to have recourse to the law. They'll say – well, they'll say, well, they lived too far away to have – to be making their trip again. They'll – they didn't get close enough to the hotel. They didn't – it's always going to be something else, but the result is going to be the same. Well, can I ask one question? In your second complaint, you alleged that the online reservation system was showing that there was – but that when she tried to get them, they were always filled. Now, that's a different – that's a different allegation, is it not? Yeah. In other words, that was the – I believe that was the Red Door one. The camp field didn't make any changes. The Red Door one, every week – My question is – my question is, does that make any difference? Or are you suggesting that in addition to the online reservation system indicating accessibility or none, that every room has to be accessible so that they never get turned down? No. What we were saying is not every room has to be accessible. Just, you know – Well, but does it have to be available? What we were saying was – Does it always have to be available? What we're saying is that it didn't exist. Well, you're saying that, but do you have any – have you alleged facts supporting that other than the fact that, well, I tried several times, and I could not get a reservation? Tried every week from that week up and all the way through the very end of when the online reservation system quit taking reservations, which was May of the following year. And what is that? What is that? It was always not available. It was never available. The other rooms always were. It never was. In other words, we're saying it doesn't actually exist. That was a falsehood put up. I mean, we can't prove it except – Well, you have alleged it, and that would be a violation of your attorney's oath if you're just alleging it without any facts to prove it or to base it on. Well, that's a fact that proves it. If it's never available, even a year and a half in the future, then one can conclude it doesn't exist. Or they could also conclude that other disabled people have been making the reservation. And that's a different complaint than your original complaint. Yeah, but that's – it's not very likely. It's highly unlikely that somebody would have booked that room every single day for the entire future in which that online reservation system works. It's never available. I mean, every week was tried, every single week. And it was simply – so it's – Did anybody ever make a phone call and ask what's going on? Maybe there's some problem with their – technical problem with their reservation system. And I assume – no phone call was made, right? No phone call was made. Or email? No phone call, no email. The First Circuit is – they're one of many opinions to say that that's not what – the ADA requires full and equal treatment. It requires that the online reservation system be compliant so that people don't have to go through the extra effort of calling every hotel. Yeah, I have a little bit of a follow-up. I know you're out of time, but we just have one argument this morning. I was curious about the level of detail that's necessary because as I read the complaint, the plaintiff alleges she needs a variety of type of services to be available, grab bars, flushing devices, showers, et cetera. And I think in this world, in the ADA world, not every room in every hotel is going to have every single one of those features. And so I just wonder, in your view, does the online reservation system have to describe specifically what rooms have specifically what features, and that failure to have that level of detail would be a prima facie violation of the statute? The guidelines are not the best written. If I had written the guidelines, I simply would have said that they have to show the features and show what's accessible, but more specifically, show the features that are not in compliance with the applicable standards. The guidelines say that, but not with the articulation that one would want. But the best way to do it, of course, is to put pictures of everything in the room so that people can see the grab bars themselves, they can see the roll-in shower themselves or the tub with the fixed seats. They can see whether or not the pipes, that's really the best way to do it. But I'll be frank, the guidelines could be better written, but if one reads them 30 different times or as many times as I have, the clarity is that they have to identify all the accessible features at the hotel. I guess where I was going with that question is, and I don't know if Red Door and Campbell, the hotels are different, but if the law is unclear as to what level of detail is necessary and a disabled person has a particular need, it seems to me that that person is going to have to communicate with the facility to make sure that he or she can find a room that's consistent with the disability. If that's true, then it seems to me that until your client takes that step, we really don't have a concrete or particularized injury because we don't know if the accessible room would be satisfactory to your client, even if they had it and even if it could be reserved online. Isn't that correct? Well, providing no information is a clear violation. If they provide significant information, then there would be a question of whether or not it was sufficient or not. But the guidelines are clear enough to indicate that they need to show all the features so that people can determine whether or not they're accessible. And accessible is defined by does it comply with the applicable ADA standards, either the ADAGS or the 2010 ADA standards, which don't really have any differences between them other than the pool lift. Before I let you go, I just want you to really as clearly as you can for me to articulate what the injury in the Penn Circuit District Court, what is the injury to Ms. Loffer that you're alleging? Is it informational? Is it stigmatic? Is it a failure to be able to plan a trip? Is it failure to be able to book online? You can have all of it about it if you want, but just tell me what the concrete injury here is. It's all of the above, and it can be separated out into categories. By encountering a failure to provide information as required by the ADA, she has suffered discrimination within the meaning of the statute. That puts it under the first category identified by TransUnion as the statute governs. Secondly, that is also stigmatic injury, which is frustration, humiliation, segregation, isolation, dignitary harm. And that, according to the Atchison and Arpan courts, would satisfy the additional injury requirement imposed by Spokio and TransUnion if that's required. Is that an objective or a subjective injury? That's an excellent question. One of the concurring opinions in Arpan seems to say that it's subjective and the plaintiff's own mind and the district court can then hear the evidence and then simply say, I don't believe her and dismiss the case. So the question is, what about discrimination itself? Put it to like Evers versus Dwyer. When a black person got on the white section of the bus and was made to sit in the back, if discrimination is not an injury, then how was he injured? You say, well, I suffered stigmatic injuries, frustration, humiliation. They'll say, it wasn't your bus. He only got on that bus to challenge discriminatory practices. So if discrimination is not an injury, and these are all questions that could be presented to the Supreme Court, really. If discrimination is not an injury but simply leads to something that may be an injury for people who have suffered discrimination, then Evers versus Dwyer would have gone the other way, unless he could prove that he had to walk further because he was sitting in the back of the bus or he was sitting closer to the fumes from the engine. Because discrimination, once discrimination is no longer a harm, then it's all out the window. And that's why I think that I have good chances at the Supreme Court, as conservative as it is. In TransUnion, it identified discrimination as the example of a real-world harm to which the statute applies. I don't necessarily disagree with that, but I think the court can say that a minor encounter with discrimination may not rise to the level of enough of a harm, that there might be some more objective way to try to figure that out. It would be very difficult in the area of discrimination, obviously, because it's variable to the observer. Well, thank you for your extra time. Let's hear from the defendants. Mr. Rubel, are you ready to start? And before I switch over, any other questions for Mr. Bacon from the panel? Thanks. Mr. Rubel? Good morning. I'm pleased to court. My name is Jeff Rubel. I am representing Red Door 88. You see Mr. Stephen Rotter with me. I will be doing most of the oral argument, but Mr. Rotter is available if there are questions with regards to the companion case, Canfield, which is also inconsolidated with this action. I think Judge Kempovich had the analysis correctly, and that is, is there anything in the amended complaint in Red Door 88 or in Canfield, which basically changes the looper decision? Was there anything added by the supplemental and amended complaints in those actions, which created the downstream consequences, which are necessary for there to be an injury in fact and an actionable claim brought under the 88? I want to make sure that the court recalls the course that a tester does not by itself create standing. A tester is an individual who, without an intent to rent or purchase in a housing situation or in this situation without an intent to stay at a place, goes for the purpose of collecting evidence or information about an unlawful practice. Here is one of the real problems with what is going on in this particular case. Mr. Rubel, you hit mute. You hit mute. You hit mute, Mr. Rubel. I apologize. In the complaint, the allegations of Ms. Laufer set forth the problems that she has, and they are certainly ones that we can all be sympathetic with. But those include that she needs the ramp to meet certain construction specifications, that she needs to have the flush control of the toilet being in such a position so it isn't inconvenient to her, and other sort of amenities of significant descriptions. It takes virtually a page plus in the complaint to set forth what she needs for accessibility. The complaint also alleges what the conditions or advertisement on the website of Red Door are, and those include certain generic descriptions, such as wheelchair accessible. The problem arises then not necessarily from Red Door's posting on its website what sort of ADA compliance mechanisms it has, but rather the reg itself, which says basically that it needs to be in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs. In other words, what that regulation does is it says we, the U.S. government, give to the individual disabled person the right to dictate whether or not or state whether or not the website of the hotel that you're looking at staying at complies with the law. It is not an objective standard that can be measured by a jury or by an attorney general's office, but rather it is one that seemingly places it in the purview of the disabled person. And that is a difficult position for any public accommodation lodging place to be. Council, are you arguing that your client's online reservation system was compliant with the ADA? Yeah, that's a very good question, because the question really has to be cast as what does a compliant website look like? What information needs to be on that website? For example, there are a lot of different types of disability. If, in fact, you have someone who is blind, you know, do you have to have just braille on the elevators or do you have to have more information such as beacons to help guide them through the hallways of the hotel? If, in fact, you have a problem with hearing, what sort of accommodations do you need to have with hearing? Do we need to have a translator to say that you have a translator to be able to convert sound to text so that they can read what's going on? Or is it simply enough to put a pair of earphones on the TV? If you are, in fact, with an accessibility situation, you can have saying it's the kitchenette is accessible, but accessibility also says you need to be able to turn around. Many of the kitchenettes like that you can put out, but you cannot turn around. Do you need a state? We can turn around on our website. What you're looking at to make it a website compliant with the ADA is 200 pages worth of descriptions of what exactly the rooms that you are saying are ADA compliant. And that's a burden that's just virtually impossible to make. Could I just focus in on the injury in fact requirement for standing and ask you about one thing I see Ms. Laufer alleging here that seems a little different from what was alleged in Looper. Because here she says that she visited the area around these hotels, your hotel, in July 2021, and that the shortcomings of the online reservation system hampered her ability to find a place to stay. Now, why isn't that sufficient to state an injury in fact? I think this would be in the informational injury category. Why isn't that an injury in fact? I think it comes down to what did the court mean in the Looper decision, and that is what are the downstream consequences? Well, I guess that's right. Why isn't that a downstream consequence that she was having trouble during these travels? Well, I think because a downstream consequence needs to be not whether they plead the magic words of intends to return or something like that. What you need is an allegation of imminent harm that under the totality of relevant facts alleges a real and immediate threat of future injury. In other words, the mere fact that she couldn't get through the reservation system on this one occasion where she drove through Colorado is insufficient to establish a discrimination claim. How can you plan a trip though without having the information that she's alleged is necessary to make an informed decision about her travel plans? I think the bottom line is exactly what you asked opposing counsel, and that is on the website it says we have these sort of things. Then if you need something specific, for example, if you need to have a lift to lift you out of the pool, and it doesn't say it on the web page, you should be. It isn't discriminatory to make you say I have to call and find out whether there's a lift to lift me out of the pool. It just has to be the information is there, and then you can reach out and call to the various lodging places to see if, in fact, it has that particular accessibility aid that you may need. And in fact, when you search, that's what a lot of lodging places do. They say call it. So you're saying there's really no downstream consequences without a second step in this process, and that would be a confirmation confirmatory phone call. I think that, yeah, given the vagueness of what the standard of a website compliant ADA compliant lodging site needs to have under the regs, I think it is very difficult to say that is noncompliant, except for in the most egregious of cases, such as where you don't put anything about your ADA compliant rooms in there. But anything that you have, which is indicative of what accommodations you are making for the disabled, if you need more specific detail, you have the right and perhaps even the obligation to call and ask. It is not a matter of like with Havens, where they basically gave them the wrong information, but rather there is more information that you are seeking. And instead of what I'm saying is that the disabled person should be obligated to reach out to the entity and gather that information, as opposed to file a lawsuit and say, all right, you need to post more of this information for me because I, under the regs, have the right to dictate what you need to put on your website. I don't think it's prudent to require, I mean, to impose liability on a public accommodation place where they try to comply and make it available, make information more available, but you say you didn't put enough on there, in my opinion, and therefore you're discriminating against me and are subject to liability. Why can't we infer from the inability to book a reservation at one of the properties that it, in fact, does not exist as an accessible room or hotel? I think because there are a multitude of different reasons why that could have happened. And obviously, we did not get to the stage where that was an information which is available in the record. But certainly, one can suspect that there are problems such as rooms are already booked. There's a problem with the reservation system. There's any number of other sort of problems that could arise. And it isn't necessarily just that she couldn't get a room. Lord knows I've gone online sometimes to reserve a hotel and struggled mightily to get a reservation made myself. Online reservations are known to have problems like this. So I think just to accept the fact that I didn't get one, so it must be discriminatory, is a leap of logic and facts that is not justified in this situation. As I had indicated earlier in my argument, I think one of the key differences between these sort of cases and the Havens case is exactly what was cited in the looper. And that is, this is not a situation of misrepresentation. This is a case of where information that is sought was not as complete as the person who is seeking it would like. It is not like there was a fraudulent misrepresentation or any sort of action like that, which occurred in the Havens realty. But rather that there was information that Ms. Laufer wanted that she couldn't get off the website. That is different than what is the holding in Havens realty versus Caldwell was. Can I just ask you a question about Havens realty since you brought it up? Were the Havens realty plaintiffs asserting an informational injury or a stigmatic injury? My reading of Havens is that they were asserting a stigmatic injury. You know, what you had was, of course, a black tester and a white tester who were getting different information. And they were sitting there, sitting there, looking at it and comparing it. And they said, wait a second. We, as a black tester, weren't given the same fair information that a white tester would. And this is discriminatory. And we are stigmatically damaged by that because it's discriminatory. And we have in that Havens case a description of why discrimination can be a damage element in these sort of situations because of the long term societal conception of discrimination. The other item I really want to touch on is I think it ties into whether or not there is a right to stigmatic injury. And that is when one looks at the statute and at the regulations for remedies, the reference is for civil action for preventative relief. It doesn't reference civil action for damages. In other words, that unlike some other statutes, the ADA does not necessarily provide for an action for civil damages. It provides for an injunctive action. And, of course, then the Attorney General can step in and the Attorney General can seek civil penalties. So there is a remedy of a civil damage, but it is for the Attorney General for a civil penalty, not necessarily one where we see that the Congress intended that there be anything more than an injunctive relief remedy available under the ADA. And with that, I am out of time unless there are further questions from this panel. Any other questions? I did give Mr. Bacon extra time. So I think you've covered what you wanted to cover. But if not, yes. Mr. Bacon, I'll give you one minute to briefly respond if you wish. In answer to an earlier question, my reading of Havens Realty was that it was not about stigmatic injury because that was not, I don't think it was referenced. It was about statutory injury. It was about rights created strictly by virtue of statutes and the Supreme Court applied that in its context. Subsequent opinions referred to it as being deprived of the right to information. But I think the plain reading of Havens Realty was strictly about this is what the statute says. It gives rights to any person and therefore Plaintiff Coleman had suffered an injury even though that she had no intention of making use of the information at all. In other words, she had no downstream consequences. Also, with respect to which should this case follow Looper, this case is Looper and Tandy are in direct conflict as to whether or not Havens Realty applies at all. Stigmatic injury doesn't really factor into that equation. But in Looper, the court held that Havens Realty does not apply because that's about misrepresentation and racial animus. There wasn't any misrepresentation or racial animus in Tandy. And yet that court held that Havens Realty applies to the ADA because the operative language was substantially similar and that the statute conferred rights to disabled person regardless of their intention when they encountered discriminatory violations. That then was followed by the 11th Circuit in Houston v. Merritt which was then followed by this court again in the Abercrombie case and is now the law in six different circuits. Looper is the one case that – Go ahead and sum up. In Looper, it didn't indicate why it disagreed with Tandy or address the fact that Tandy had held that Havens Realty applies to the ADA. Those two decisions can't be reconciled. All right, counsel. Thank you very much. I appreciate the arguments in an interesting case. You're excused and the case will be submitted.